General Term—May, 1855.

Before Judges STORER, GHOLSON, and SPENCER.

JOHN M. CORNWELL et al. *vs*. ELI KINNEY, ESPY et al.

A. & B., Bankers of Pittsburgh, having dealings with C. & D., bankers of Cincinnati, in the course of which they transmitted, on several occasions, checks upon New York and New Orleans, for credit, and sundry bills on time for collection, and at the same time, drew upon C. & D. for divers sums, whereby they became indebted to C. & D. in a considerable balance. *Held:* that C. & D. had a lien upon the paper, sent them for collection, in respect of the credit given thereto, for the amount of such balance.

And although such bills had been deposited with A. & B. by a customer for collection merely, yet the same being endorsed in blank: *Held*, that C. & D. being holders for value, without notice, were not liable to an action by the customer.

A banker has a general lien upon any securities of his customers, coming into his hands in the ordinary course of business, as banker, for any balance due him from such customer.

When the owner of a bill endorses it in blank, and hands it to another for collection, he thereby holds out the latter to the world as the owner, and is bound by any credit given in good faith to the latter, in respect of such apparent ownership.

The opinion of the Court was delivered by SPENCER, J.

This is a petition in error, to reverse a judgment rendered by GHOLSON, J. at Special Term. The facts upon

which the judgment of the Court was founded, as they appear in the bill of exceptions, made part of the record, are these. On the 18th day of July, 1854, the plaintiffs, residing in Pittsburgh, drew a bill of exchange upon J. S. Fountain of Cincinnati, for $95.50, payable to their own order, in four months after date, which was duly accepted, and being endorsed in blank, was delivered by the plaintiffs to Wilkins & Co., bankers of Pittsburgh, for collection. On the first day of August, 1854, the plaintiffs drew two other bills of exchange, in the same form; one upon Rowe, Park & Co. of Cincinnati, for $204.25, payable in four months after date, and the other upon Hunter, Coburn & Co. of Cincinnati, for $326.50, payable in six months after date; which were in like manner accepted by the drawees, and endorsed and delivered by the plaintiffs to Wilkins & Co., for collection. On the 20th day of October, 1854, without any previous dealing, or special understanding between the parties, Wilkins & Co. opened an account with the defendants, who were bankers in Cincinnati, by making them a remittance of $250, in depreciated bank notes, to be placed to their own credit; at the same time drawing upon the defendants for $48.38. On the 21st October Wilkins & Co. remitted in like manner, for collection and *credit*, a draft upon H. F. Amberg for 482 guilders; and subsequently gave orders to have the same cashed. On the 26th October, they again remitted for credit their own check on Atwood & Co. of New York, for $1400, and at the same time drew a sight check upon the defendants for $1500; stating, in their accompanying letter of advice, that their cash balance on hand, added to the check remitted, would more than cover the amount drawn for, and was intended "as

an equivalent for it;" they also remitted two of the drafts above referred to, claimed by the plaintiffs, using the following language contained in the same letter of advice, "For *collection* we enclose,

"Cornwell & Kerr on Rowe, Park & Co., due December 1–4, $204.25.

"Same on Hunter, Coburn & Co., $326.50."

The check for $1500 was paid by the defendants, leaving a small cash balance still in their hands to the credit of Wilkins & Co. On the 27th of October Wilkins & Co. remitted for their *credit*, to defendants, in uncurrent bank bills, $52.00, and their own check on A. Bean & Co., of New Orleans, for $1,000; and at the same time drew upon the defendants for $1,000; they also remitted "for collection and *credit when paid*," two small drafts; one for $95.50, (being that first above described, and claimed by the plaintiffs,) and the other for $80.00. The check for $1,000 drawn upon them was duly honored by the defendants; but not wishing exchange upon New Orleans, they *immediately* returned, by letter, to Wilkins & Co. the check drawn upon Bean & Co. for $1,000, requesting them to place the same amount to their (defendants') credit with C. W. Rockwell, Esq., in New York; which request Wilkins & Co. failed to comply with, although by letter of 2d November, they promised so to do.

At this time, the defendants had advanced in cash to Wilkins & Co., (in all,) $2,557.38; and had received from them in cash $1,708.35; leaving a balance in favor of the defendants of $849.03; to meet which, the only apparent security they then held was the guilder draft, and the other paper put in their hands for collection by Wilkins & Co., as follows:

Guilder draft, estimated, and afterwards cashed at $192.80

| | | |
|---|---|---|
| Acceptance, | Hunter, Coburn & Co. | 326.50 |
| " | Rowe, Park & Co. | 204.25 |
| " | J. S. Fountain | 95.50 |

626.25

"       E. J. Butler _____ .80.00

Amounting in all to _____ $899.05

Leaving a surplus of apparent security in the defendants' hands, of about $50.00. On the 3d day of November, the defendants received from Wilkins & Co., and placed to their credit another check, drawn by them on Atwood & Co., of New York, for $700; and at the same time paid a check drawn upon them by Wilkins & Co. for $800, not having yet heard from Wilkins & Co., in regard to the Bean draft for $1,000. The check for $700, drawn in favor of defendants, was dishonored; and, (as before stated,) Wilkins & Co. failed to comply with the defendants' request to place the amount of the Bean draft to their credit in New York. No further transactions took place between the parties. On the 10th day of November, the defendants heard of the failure of Wilkins & Co., and immediately sent an agent to Pittsburgh, to procure a settlement of accounts; the agent arrived on the day following; and proposed to Wilkins & Co. that the paper in the hands of the defendants for collection, should be at once placed to their credit. This Wilkins & Co. declined; observing, that the paper had been left with them for collection merely, and belonged to the plaintiffs, Cornwell & Kerr. Thus, the defendants became apprized, for the first time, of the true state of the case. On the 13th day of November, Wilkins & Co. gave an order to the plaintiffs upon the defendants, for the paper alleged to belong to the former. This order was presented by the

plaintiffs to the defendants, *before* the maturity of any of the paper, accompanied by a demand that the same should be given up; but the defendants refused compliance with the demand, unless an equal amount of the indebtedness from Wilkins & Co. to them, (then greatly exceeding the amount of the notes,) should be first paid. Whereupon the present action was brought for an alleged conversion of the plaintiff's property.

It appeared further on the trial, by the testimony of one of the defendants, that a large proportion, perhaps to the extent of one half, if not more, of all the paper transmitted through banking houses for collection, is not their own property, but belongs to their *customers*; that the same is usually endorsed in the same mode by whomsoever owned; and when collected is placed to the credit of the last endorser, in the absence of special directions; that the paper in controversy was transmitted by Wilkins & Co., specially endorsed by them to the defendants; that the defendants supposed this paper to belong to Wilkins & Co., at the time of their payment of the check for $1,000, drawn October 27th; and that when they returned the Bean draft for $1,000, they relied in part upon the collection notes then in their hands, as security for the repayment of the amount of their advances, and partly upon the individual credit of the drawers.

Upon this state of facts, the Court found the law of the case to be with the defendants, and accordingly entered up judgment in their favor.

This judgment of the Court is supposed to be erroneous upon one of two grounds. 1. Because Wilkins & Co., being mere trustees of the plaintiffs, could not transmit any better right to the defendants in this paper, than they

themselves had; and the fact, (well known to the defendants,) that a large portion of such paper, in the hands of bankers belonged to their customers, was calculated to throw suspicion upon the ownership of this paper, and should therefore have put the defendants upon enquiry as to its *true* ownership. Having failed to make such inquiry, the defendants by their neglect are chargeable *in law*, with notice of the plaintiffs' rights. 2. That as against Wilkins *&* Co., the defendants had no right to retain this paper as security for the balance due them.

I. Upon the first of these propositions, we remark, that when the plaintiffs placed these bills in the hands of Wilkins & Co., for collection, they endorsed them in blank or generally; thereby not only investing Wilkins & Co. with the legal title thereto *in fact*, but holding them out to the world as the real owners of the bills, and by their endorsement pledging *their own responsibility* for all the acts of Wilkins & Co., in relation thereto. Had Wilkins & Co. then disposed of them for value paid, or in discharge of a *precedent debt*, due from them to the defendants, or as security for advances then made them, or to be made, *without notice* of the trust upon which they had received them, there is no doubt that the defendants would have been entitled to hold them, as against the plaintiffs. So also had they in like manner pledged them for a balance of account, then due, or to become due defendants. Messick & Co. *vs.* Roxborough et al., 1 *Handy* 348, and cases cited. Atkinson *vs.* Burke, decided by the Supreme Court of Vermont, April T. 1854, *Vol.* 7 *Law Register* 631, where all the authorities are ably reviewed. Nor does it seem to us, that the fact that such paper is in the frequent course of trade and business deposited in

John M. Cornwell et al. *vs.* Eli Kinney, Espy et al.

bank for *collection merely*, furnish such evidence of a want of ownership in the banker, as to put a party dealing with him upon enquiry into the truth of such ownership. To hold this, would greatly impair, if it did not entirely destroy the peculiar value of commercial paper; whilst, at the same time, it would violate every principle of the law of evidence, as applicable to presumptions. To secure the highest beneficial use of commercial paper; every facility for its transfer from hand to hand should be afforded; and every presumption should be made in favor of the title of the *holder* thereof, consistently with that appearing from the instrument itself. So the law presumes every holding to be in consonance with the *title exhibited*, especially when it might otherwise stand indifferent as to ownership. Whenever, therefore, the owner of such paper gives it currency, by endorsement or otherwise, and thus proclaims the holder of it to the world as its *true owner*, he is bound to presume that *credit* will be given to his own declaration; and is justly chargeable with all the consequences which may follow from the credit thus given; he is entitled to no higher consideration than is he in whom the confidence is reposed, and should be measured by the same standard of equity.

How then would the case here stand as between these defendants and Wilkins & Co.?

II. It is claimed by the plaintiffs, that as against Wilkins & Co., the defendants had no right to retain this paper, as security for the balance due them. 1st. Because there was no *express* agreement to that effect, and it never could be *implied* from the course of dealing between the parties. 2d. Because, if such agreement would ordinarily be implied, such implication is repelled in the present

case, by the fact, that the paper was deposited with the defendants, for a *special purpose* only, viz. *collection*, and therefore no credit was, or should have been given to it by them, in their transactions with Wilkins & Co.

1. It is certainly true, that no *express* agreement of the kind referred to existed between the parties, nor does it seem *necessary* to resort to the principle of an implied agreement, further than the same would be presumed from the general usage of business, to justify the defendants' claim. Since the case of Davis *vs.* Bowsher, 5 *T. R.* 448, it has been held uniformly in England, that a banker has a lien for his *general balance* upon all the paper securities of a customer, to whom advances have been made, which have come into his hands, in the usual course of business as banker, except such as may have been deposited with him, under a particular agreement, which enables his customer to withdraw them. That was a case, where a banker had been in the habit of receiving, from time to time, bills from a customer for *collection*, and making advances in the shape of discounts of particular bills, part of those deposited; it was held, that the customer could not withdraw from his hands the bills which were *not* discounted, without paying the amount due upon those which *were*. Lord Kenyon, in pronouncing his opinion, was disposed to put the case not upon its own peculiar circumstances, but upon a general rule of law and usage of trade, which he considered so well settled, that he would not allow it to be regarded as at all doubtful.

Numerous cases following this have occurred, in which the nature and extent of bankers' liens have been much discussed; but whilst they present occasional instances of exception to the rule, they all concur in allowing it to the

full extent, as above laid down. And in the recent case of Barnett *vs.* Brandao, 6 *Man. & Grang.* 630, which was very thoroughly argued, the general doctrine was fully admitted by all. Chief Justice Denman there speaks of the banker's lien upon the securities of his customers for a general balance due him, as part of the *law merchant* of England, of which the Court is bound to take *judicial notice*, and "such is the general understanding of the profession."

The same rule seems equally well established in the United States, and is recognized as in full force by *all* the text writers. 2 *Kent* 641, *Story Con.* § 181. In the case of The Bank of the Metropolis *vs.* The New England Bank, 17 *Pet.* 179, *S. C.* 1 *How.* 234, Chief Justice Taney adopts the precise language used by Lord Kenyon in Davis *vs.* Bowsher, and adds, "there is no doubt of the "banker's right to retain his customers' securities for a "general balance due him; because, it has been long "settled." And had there been any doubt upon the subject, the able and industrious counsel for the present plaintiff would have succeeded in finding some authority suggestive of such doubt.

The principle of the case from 17 *Peters*, was fully recognized and acted upon, by our own Supreme Court, in Gordon *vs.* Kearney, 17 *Ohio* 572. There the plaintiff, residing in Pittsburgh, had drawn a bill at 30 days payable to his own order, upon parties residing in Zanesville; and having endorsed it in blank, deposited it with Warrick, Martin & Co., exchange and money brokers of Pittsburgh, for collection, who endorsed it specially to the defendant, a broker of Zanesville, and sent it to him for *collection*. There had been for several years prior to this

frequent correspondence between the parties, growing out of their business as brokers; each transmitting to the other from time to time notes for *collection*, and upon receiving payment, crediting the same to the other in account, subject to checks; and periodical statements were made between the parties, showing how their accounts stood. At the time of transmitting the draft in controversy, Warrick, Martin & Co. were indebted to the defendant in a balance of $233.10, of which a small part was advanced the day before. No further transactions took place. Before the maturity of the bill, Warrick, Martin & Co. having failed, gave an order for the bill to the plaintiffs, who demanded its return from the defendant; the latter refused, claiming a lien upon it for the balance of his account. It was held that the claim was well founded, and that the plaintiffs could not recover from the defendant; because of the *credit* given by the latter to the bill.

The only difference between that case, the case cited from 17th *Peters*, and the one under consideration is, that in the two former there had been a long course of dealing between the respective bankers and brokers, during which credit had been given by each to the other, for the collections made by each; whilst here, the dealing between the parties had just commenced. But the ground upon which they all rest is precisely the same; and that is, that the parties are supposed to deal with each other upon the faith of the securities in the hands of each. The fact, that in those cases there had been a long course of dealing between the parties, was considered of no further consequence than as it furnished *evidence* of the *credit* given by each party to the paper deposited by the other, for *collection*. In commenting upon The Metropolis Bank *vs*.

64

The New England Bank, 17 *Pet. ub sup.*, Chief Justice
Taney, in Wilson *vs.* Smith, 3 *How.* 770, says, "the right
to retain in that case depended upon the fact that *credit
was given.*" So, the principle upon which the banker's
lien depends, is the supposed credit given in all cases by
a banker to all the paper put into his hands by his cus-
tomer, in the usual course of business as banker, as se-
curity for advances made, or credit extended. To render
this principle of any value, it is necessary that it should
be *uniform* and apply alike to all cases, whether the trans-
actions have been *recent*, or of *long standing*.

In accordance with this view, is the case of Barnett *vs.*
Brondas 6, *Man* & *Gr.* already cited. Thus, one Burns had
been dealing with the defendant as his banker for several
years, during which he had never overdrawn his account
but *once*, and that for a small amount by mistake. He
had also been in the habit of leaving on special deposit
with the defendant, for safe keeping merely, a large amount
of exchequer bills, belonging to the plaintiff and others,
enclosed in a tin box, of which he himself kept the key.
These bills were taken out by him from time to time and
put into the hands of his banker for the sole purpose of
receiving the interest thereon, and getting them exchanged
for new ones issued by the Government. The interest
was credited to Burns; and the bills received in exchange,
handed back to him, and placed in the box; in some in-
stances, not until after they had been left carelessly in the
hands of the banker for some time. In the long course
of dealing between the parties, no advances had ever been
made on account of these bills. Finally, Burns took out
of his box a large amount of the bills belonging to the
plaintiff, and handed them, as usual, to the defendants, for

the purpose of receiving the interest and having them exchanged; which was accordingly done. Meanwhile, Burns became ill, and unable to attend personally to his business; but, at the instance of his clerks, he signed checks upon his banker from time to time, never overdrawing his account. The paper of Burns was made payable generally to his bankers. It so happened, that during his sickness, certain acceptances of his were paid by his banker, amounting to £4,800, which exceeded his balance then on hand, some £3,200. Burns failed, and it was held that the banker had a right to retain, on the balance due him, as against the plaintiff, their true owner, the exchequer bills which had thus come into his hands, not for credit, but for a specific purpose. Here was a single transaction of credit, not based upon a long course of dealing, in connection with such securities, nor based upon any *apparent* reliance on the bills in the particular transaction, and yet, the lien was maintained on the simple principle, that in all such cases, credit must be *presumed* to have been given upon the faith of *all* the securities in the hands of the banker, in the usual course of his business as such.

2. The other, and only remaining objection, raised by the plaintiff's counsel to the right of the defendants in the present case, is, that the bills in controversy were deposited with the defendants for *collection merely*, and therefore, no credit was, or should have been given to them by the defendants in their transactions with Wilkins & Co. That such credit was in *fact* given, is not only sworn to by one of the defendants, but seems highly probable from the circumstances of the case. That such credit will be *presumed* to have been given, and that the defendants were

justified in giving it, is fully warranted by the case last under examination. There, also, it was said, that the bills were delivered to the bankers for a *special purpose,* viz : to receive the interest thereon, and procure those to be exchanged for others, and when that duty was performed, they should have been returned to their original custody. But the Court replied, (page 670,) it is true, " the bills " were delivered for a *special* purpose, but that purpose " was the performance of *a duty as bankers.* The exche- " quer bills received in exchange were equally in the bank- " er's possession in the course of business, whether intend- " ed to remain in their custody until it should suit the " convenience of Burns to call for them, (*which was the* " *fact,*) or until he should choose to sell them, or have " them again exchanged. If Burns had placed a *bill of* " *exchange* payable to bearer, or *endorsed in bank,* in the " hands of the bankers, to be received, or with directions " not to receive it in cash, but procure it to be renewed, " and hold the renewed bill until called for, and had over- " drawn his account, whilst either the original or renewed " bill was in their hands, no doubt could be entertained " that the bankers would have had a lien ; and this case " is in substance the same—in both, the securities are " in the bankers' hands in the *usual course* of their bu- " siness."

So in the case now before the Court ; the bills, although sent to the defendants, for the special purpose of *collection* merely, were sent as the property of Wilkins & Co. to be collected by the defendants, in their usual *course of business* as bankers, for the account of Wilkins & Co. to whose credit the proceeds thereof, when collected, were ex- pected to be placed. The defendants, therefore, had a right

to rely upon them as security for any advances they might make to Wilkins & Co. in the same course of business.

We are of opinion, therefore, that the judgment of the Court at special term was right, and should be affirmed with costs.

E. J. HENRY, for plaintiffs.

WORTHINGTON & MATTHEWS, for defendants.